IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRUCE KIRBY,
    *Plaintiff*,

v().   Civil Action No. ELH-13-00012

FRONTIER MEDEX, INC.
    *Defendant*.

**MEMORANDUM OPINION**

Bruce Kirby, plaintiff, has filed suit against his former employer, Frontier Medex, Inc. ("Frontier"), defendant, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The dispute arises from Frontier's denial of severance benefits to Kirby under an Executive Change in Control Severance Pay Plan (the "Severance Plan" or the "Plan"), an unfunded Employee Welfare Benefit Plan as defined in 29 U.S.C. § 1002(1).

While plaintiff was an employee of MEDEX Global Group, Inc. ("MEDEX"), he was a Participant in its Severance Plan. MEDEX subsequently merged with Exploration Logistics Group ("ELG") to form Frontier, and plaintiff became an employee of Frontier. The merger constituted a "Change in Control" event under the Plan. According to Kirby, he experienced a "Qualifying Termination" from his employment with Frontier because he was terminated within one year following the change in control event. As a result, plaintiff claims that he is entitled to severance benefits under the Plan; he seeks to recover $750,000 in benefits, along with prejudgment interest and attorney's fees.

In particular, Kirby contends in Count I that Frontier breached its obligations under the Severance Plan by failing to pay severance benefits due under the Plan, in violation of 29 U.S.C.

§ 1132(a)(1)(B). As to Count II, plaintiff claims, in the alternative, that Frontier unlawfully interfered with his right to obtain severance benefits, in violation of 29 U.S.C. § 1140, by manipulating the date of his termination so that it occurred just beyond the window that otherwise would have made him eligible for severance benefits.[1]

Defendant has filed a motion to dismiss ("Motion," ECF 14), along with a memorandum ("Memo," ECF 14-1) and exhibits. According to Frontier, pursuant to the express terms and conditions of the Severance Plan, Kirby is not eligible for severance benefits. Plaintiff opposes the Motion ("Opp.," ECF 15), and defendant has replied. *See* ECF 20. No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion, in part, and deny it, in part.

## Factual and Procedural Background[2]

Kirby was employed as the President and Chief Executive Officer of MEDEX, which established and implemented an Executive Change in Control Severance Pay Plan on January 1, 2010. Complaint, ECF 1 ¶¶ 5, 6. The Plan was designed to "provide severance benefits to a select group of executives in the event of the executive's separation of employment in connection with a change in control" of MEDEX. Plan at 1. The Plan was "adopted with the understanding that it is an unfunded welfare plan maintained primarily for benefit of a select group of management or highly compensated employees within the meaning of [ERISA]. . . ." *Id.* § 5.1. As noted, Kirby was a Participant in the Plan. Complaint ¶ 7.

---

[1] Plaintiff's suit also contained a claim for common law breach of contract (Count III). On February 20, 2013, the Court dismissed that count, with prejudice, pursuant to the parties' Stipulation of Dismissal. *See* ECF 9, 10.

[2] As discussed, *infra*, the Court assumes the truth of the factual allegations for purposes of the motion to dismiss.

On February 16, 2011, MEDEX stockholders approved a merger between MEDEX and ELG. The parties agree that the merger constituted a "Change in Control" event as defined in § 6.1.7 of the Severance Plan. *See id.* ¶ 8; Memo at 4. The merger was consummated on March 10, 2011, and MEDEX and ELG began operation as Frontier Medex, Inc. Complaint ¶ 10. After the merger, Kirby served as President of Frontier and as Chief Operating Officer of the Americas. *Id.* ¶ 11.

Among other things, the Plan provided that a Participant would be eligible for severance benefits if he "experience[s] a Qualifying Termination that occurs within one year following [a] Change in Control . . . ." Plan § 2.1(b). It is undisputed that, because the Change in Control occurred on February 16, 2011, plaintiff's eligibility for severance benefits under the Plan expired one year from that date. Therefore, if plaintiff was terminated prior to February 16, 2012, he would qualify for severance benefits under the Plan. If Kirby was terminated after that date, he would not be eligible for severance benefits. *See* Plan §§ 2.1(b) and 3.3.

According to plaintiff, Tim Mitchell, Frontier's Chief Executive Officer, told plaintiff on November 16, 2011, that he intended to terminate plaintiff's employment upon the expiration of the "change in control period." Complaint ¶¶ 12, 13. On January 24, 2012, Kirby was informed, in writing, that he would be terminated, effective February 23, 2012—one week after the expiration of the qualifying period for severance benefits. *See* Notice of Termination, ECF 14-3. But, as of January 24, 2012, Kirby was immediately placed on "garden leave," *i.e.*, he was relieved of all of his responsibilities, and his access to Frontier's systems and facilities was terminated as of that date. Complaint ¶ 16. Nevertheless, Kirby's pay and benefits continued through February 23, 2012. *See* Notice of Termination.

The Notice of Termination provided to Kirby on January 24, 2012, stated, in part:

> This constitutes written notice of the termination . . . From today through your termination date, you will be placed on garden leave, meaning that you will continue to receive full pay and benefits, but you will not be asked to provide any additional services to the company. You should not take any company property with you when you leave today. Any company property that you possess that is not with you today should be returned to the company promptly. Your building access to Frontier MEDEX systems and facilities will be terminated, effective immediately. After your termination date, your accrued but unused vacation will be paid to you.

Thereafter, plaintiff filed a claim for severance benefits pursuant to the Plan. Complaint ¶ 32. The claim was denied by the Plan administrator and upheld on internal appeal. *Id.* ¶ 19.

Several provisions of the Plan are relevant to the parties' dispute.

Under § 2.1 of the Plan, severance benefits are provided to eligible Participants. However, two conditions must be satisfied to qualify for severance benefits. First, there must be a change in control, Plan § 2.1, and second, "a Participant must: . . . experience a Qualifying Termination that occurs within one year following such Change in Control . . . ." Plan § 2.1(b).

Pursuant to § 6.1.20 of the Plan, a Qualifying Termination is a "termination of employment of a Participant with the Employer as a result of a termination: (a) by the Employer for any reason other than Cause; or (b) by a Participant for Good Reason. Qualifying Termination shall not include termination or reassignment of the Participant's employment for Cause, or by reason of Disability or death." *Id.* § 6.1.20. The phrase "termination of employment" is not defined in the Plan.

Section 2.2 of the Plan, titled "Notice of Termination," is also relevant. It provides, in part, that "any termination of employment by the Employer or the Participant shall be communicated by Notice of Termination to the other party . . . ." *Id.* § 2.2. A Notice of Termination is defined as "a written notice which sets forth in reasonable detail the facts and circumstances claimed for termination of the Participant's employment . . . and, if the Date of

4

Termination is other than the date of receipt of such notice, specifies the Date of Termination (which Date of Termination shall not be more than the 30 days after the giving of such notice) . . . ." *Id.* § 6.1.16. And, § 6.1.9 defines "Date of Termination" as "the date specified in the Notice of Termination . . . ."

Section 3.3 of the Plan, titled "Automatic Sunset,"[3] provides, in part: "If a Change in Control occurs, the Plan shall terminate without required action by the Company after the expiration of a one year period following such change in control. . . ."

Section 4 of the Plan governs "Determinations And Claims." Section 4.1 states, in part: "The Company shall have the discretionary authority and responsibility to interpret and construe the Plan and to determine all factual and legal questions under this Plan, including . . . the entitlement of Participants . . . provided, however, if a Change in Control occurs, then the Company shall forfeit such discretionary authority with respect to the Plan and, with respect [to] any litigation regarding the benefit payable to . . . a Participant, determinations by the Company shall not be afforded any deference and the matter shall be heard *de novo.*"

Section 5 of the Severance Plan contains miscellaneous provisions. Pursuant to § 5.4, the employer is not obligated to retain a Participant as an employee. Under § 5.12, "[a]ll notices and other communications . . . shall be in writing and shall be given by hand delivery . . . or by registered or certified mail . . . ."

**Standard of Review**

Frontier has moved to dismiss plaintiff's Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[3] Under § 6.2 of the Plan, titled "Rules of Interpretation," the titles of sections "are inserted for convenience of reference only and are not part of this Plan Statement. . . ."

570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also, e.g.*, *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (applying *Twombly* plausibility standard).

Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Twombly*, 550 U.S. at 554–55. Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a plaintiff need not include "detailed factual allegations," the rule demands more than bald and conclusory accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of the rule, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (alteration in original) (internal quotation marks omitted). A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555.

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385–86 (4th Cir. 2009). And, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of

6

misconduct," the complaint has not shown that "the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Frontier has submitted several exhibits to support its Motion. In resolving a motion under Rule 12(b)(6), a court ordinarily "is not to consider matters outside the pleadings or resolve factual disputes." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). Generally, if a court considers material outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Under Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2011 Supp.); *see Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).

There are, however, limited circumstances in which a court may consider extrinsic documents in the context of a motion to dismiss, without converting the motion to one for summary judgment. For instance, the court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted); *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 195 n.5 (4th Cir. 2002) (stating that district court correctly considered ERISA plan agreement because plaintiff

referred to and relied on the existence of "an agreement for medical-related services" between herself and defendants).

As indicated, in support of its Motion, Frontier submitted a copy of the Plan and a copy of the Notice of Termination. Both were referenced in the Complaint and central to it. Plaintiff's claims are predicated on his alleged entitlement to benefits under the Severance Plan and his rights under ERISA, and therefore the Severance Plan and the Notice of Termination are integral to the Complaint. Nor does plaintiff dispute the authenticity of any of the documents submitted by defendant. Therefore, I may consider them without converting the Motion to one for summary judgment.

The parties agree that a *de novo* standard of review applies to the administrator's interpretation of the Severance Plan. *See* Plan § 4.1; Memo at 7; Opp. at 2; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").[4]

**Discussion**

In Count I, Kirby contends that Frontier breached the Plan by refusing to pay him the severance benefits to which he is contractually entitled. This claim is predicated on Kirby's contention that he was terminated on January 24, 2012. Frontier counters that Kirby is not

---

[4] The defendant seems to suggest that because the relevant terms of the Plan are "clear, unambiguous, and susceptible to only one reasonable interpretation," Memo at 7, the Plan Administrator is entitled to deference. *See id.* ("[T]he Plan Administrator's decision to deny Plaintiff's claim must be upheld as a matter of law, regardless of the standard of review."); Reply at 4 ("[W]hether this Court applies a discretionary standard of review or the *de novo* standard, the Plan Administrator's interpretation of the Plan was the only reasonable interpretation as a matter of law."). The presence of unambiguous contract terms has no bearing on whether the Court must defer to the administrator's interpretation.

eligible for severance benefits under the Plan because he was not terminated until February 23, 2012, and therefore Frontier was not liable for severance benefits under the Plan.

As noted, to qualify for severance benefits under the Plan, a Participant must be terminated within one year following a change in control event. Plan § 2.1(b). The parties agree that the merger between MEDEX and ELG constituted a "Change in Control." But, they disagree as to whether Kirby experienced a Qualifying Termination within one year of the Change in Control. Thus, with respect to Count I, the parties dispute the date on which Kirby was terminated and, more broadly, how the date of a Qualifying Termination is determined under the Plan. If plaintiff experienced a Qualifying Termination on or before February 16, 2012, as he contends, the parties agree that he would be entitled to severance benefits.

Frontier argues that the unambiguous terms of the Plan mandate the conclusion that the Qualifying Termination occurred on February 23, 2012. It points out that "Date of Termination" is a defined term in the Plan. In particular, § 2.2 of the Plan required Frontier to provide plaintiff with a "Notice of Termination." Memo at 8. Pursuant to § 6.1.16 of the Plan, the Notice of Termination had to specify the "Date of Termination" if the Date was other than the date of receipt of the notice. But, the Date of Termination could not be "more than 30 days after the giving of such notice." Plan § 6.1.16. It is undisputed that Frontier gave Kirby a Notice of Termination on January 24, 2012, *see* ECF 14-3, which specified February 23, 2012, as the effective date of the termination. Memo at 2. Therefore, Frontier contends that the Qualifying Termination occurred on February 23, 2012, and thus Kirby is not entitled to severance benefits.

Plaintiff claims that the "Date of Termination listed on the Notice of Termination is not relevant to the issue of when in fact a Qualifying Termination occurs." Opp. at 9. According to plaintiff, the "Date of Termination concept [only] appears to have any significance . . . in Section

9

2.6 where such date has relevance for the purpose of addressing the situation where an employee leaves employment between the date of the notice and the designated date of termination." *Id.* According to Kirby, the Date of Termination "does not serve to answer the question as to when a qualifying termination occurs." *Id.* at 8.

In support of his argument, Kirby notes that the Plan's definition of "Qualifying Termination" does not refer either to the Notice of Termination or the Date of Termination, but rather uses the phrase "termination of employment," which is not defined in the Plan. Because the phrase "termination of employment" is not defined in the plan, Kirby maintains that it should be "interpreted in accordance with its generally accepted usage," rather than with reference to the Date of Termination. *Id.* In Kirby's view, under "generally accepted usage," his "termination of employment" occurred on January 24, 2012, when he was relieved of all of his responsibilities, required to return all company property, and denied access to Frontier's Systems and Facilities. *Id*. at 5–6. Although plaintiff acknowledges that defendant "was going to continue to pay the Plaintiff his salary and benefits through February 23, 2012," plaintiff contends that "the complete and total curtailment of Plaintiff's work activities as of January 24 strongly cuts in favor of the conclusion that the Plaintiff was in fact terminated on January 24 . . . ." *Id.* at 6.

Accordingly, with regard to Count I, the question is whether a Participant's eligibility for severance benefits under the Plan is determined with reference to the Date of Termination in the Notice or, alternatively, with reference to some other date, conduct, or action of the employer. In my view, plaintiff's argument that the Date of Termination in the Notice does not reflect the actual date on which he was fired is more aptly addressed with respect to Count II, *infra*. As to Count I, the matter before the Court is one of contract interpretation. The only reasonable

interpretation of the Plan establishes that a Qualifying Termination occurs on the Date of Termination specified in the Notice of Termination.

"Although courts apply federal common law rules of contract interpretation when construing a policy governed by ERISA, [they] look to 'principles of state common law to guide [their] analysis.'" *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013) (internal citations omitted) (quoting *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995)). Accordingly, the Plan must be interpreted with reference to both state law and general contract law principles.

General principles of contract law require that federal courts enforce "the plan's plain language in its ordinary sense." *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir. 1996) (internal quotation marks and citations omitted). And, courts should determine the ordinary meaning of terms "as a reasonable person in the position of the plan participant would have understood the words." *Johnson*, 716 F.3d at 820 (internal citations omitted).

Moreover, "ERISA plans, like contracts, are to be construed as a whole." *Id.* Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). And, "a court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992); *see US Airways, Inc. v. McCutchen*, ___ U.S. ___, 133 S. Ct. 1537, 1548 (2013) (ERISA's "statutory scheme, we have often noted, is built around reliance on the face of written plan documents." (internal quotation marks omitted)).

If the terms of a contract are unambiguous, the Court may interpret the contract as a matter of law. *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992). However, if "contract language is ambiguous, meaning that it is susceptible to different reasonable interpretations, it is for a jury to determine the proper interpretation." *Brown v. McCormick*, 23 F. Supp. 2d 594, 606 (D. Md. 1998). In the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 394 (D. Md. 2011) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

The Plan as a whole contemplates only one method by which a Participant's employment may be terminated. Specifically, § 2.2 provides that "*any* termination of employment by the Employer or the Participant *shall be* communicated by Notice of Termination to the other party hereto given in accordance with Section 5.12." *Id.* (emphasis added). In turn, under Plan § 6.1.16, the required Notice of Termination must:

> Set[] forth in reasonable detail the facts and circumstances claimed for termination of the Participant's employment . . . and, if the Date of Termination is other than the date of receipt of such notice, specifies the Date of Termination (which Date of Termination shall be not more than 30 days after the giving of such notice)."

In this way, the Plan clearly sets forth the process by which a "termination of employment" occurs. Any "termination of employment" requires the issuance of a Notice of

Termination. And, the Notice of Termination generally must specify a Date of Termination, which cannot be more than "30 days after the giving of such notice." Plan § 6.1.16. Defendant's interpretation simply posits that any "termination of employment" takes place on the "Date of Termination," as set forth in the Notice of Termination.

In contrast, plaintiff's argument would have the Court cast aside the series of provisions governing the method contemplated for terminating a Participant's employment. Plaintiff would have the Court ignore the Date of Termination when determining the date on which a termination occurred. And, he would have the Court subordinate the definitions on the face of the Plan to those the Court can cull from "ordinary use" and "common understanding," in contravention of the Fourth Circuit's admonition not to depart from the written terms of an ERISA plan. *See Coleman*, 969 F.2d at 56; *cf. McCutchen*, 133 S. Ct. at 1549 ("The express contract term, in short, contradicts the background equitable rule; and where that is so, for all the reasons we have given, the agreement must govern.").

Regardless of whether plaintiff believes the Date of Termination listed by Frontier is an accurate reflection of the date on which his employment ended, the Plan unambiguously provides that plaintiff's eligibility for severance is determined with reference to the Date of Termination specified in the Notice of Termination. It is undisputed that Kirby's Date of Termination was February 23, 2012, *see* ECF 14-3, and it is undisputed that this date falls outside of the one-year window for severance eligibility. Accordingly, plaintiff is not entitled to severance under the terms of the Plan. Therefore, I will dismiss Count I of the Complaint.

In Count II, Kirby raises an alternative argument, to be considered "in the event it is found that the Defendant did not breach the terms of the Severance Plan by failing to pay the Plaintiff severance benefits . . . ." Complaint ¶ 37.

Kirby alleges that Frontier manipulated the Date of Termination, and in doing so, interfered with his rights under ERISA. Plaintiff asserts that he was effectively terminated on January 24, 2012, but that Frontier improperly claimed that Kirby's termination was not effective until just after the expiration of the one-year window, with the intent and purpose of depriving him of his severance benefits. To that end, it maintained Kirby on the payroll just long enough to to deprive him of severance benefits. Frontier responds that "keeping an employee on the payroll to avoid paying severance benefits does not constitute an adverse employment action and is not conduct prohibited under ERISA." Memo at 9.

Count II arises under 29 U.S.C. § 1140, which provides: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." Notably, this provision "does not guarantee every employee a job until he or she has fully vested into a company's benefit plan." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988). Rather, § 1140 prohibits unscrupulous employers from terminating or otherwise taking adverse action against an employee *with the specific intent* of preventing that employee from obtaining ERISA benefits. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). "Consequently, it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision." *Id.* at 238.

In general, there are "two avenues" at trial by which a plaintiff may prove interference in violation of 29 U.S.C. § 1140. An ERISA interference claim may be proven through direct evidence of the employer's specific intent to interfere, such as an admission by the employer that

14

it fired the employee to prevent the vesting of his benefits. *See Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 452 (D. Md. 2012). The Fourth Circuit recognizes, however, that "employers do not often articulate the motivation for their actions, particularly if those actions are unlawful." *Id.* Accordingly, employees may also utilize the burden-shifting approach articulated by the Supreme Court in the Title VII context in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

Under the *McDonnell Douglas* scheme, the plaintiff at trial must first establish, by a preponderance of the evidence, a *prima facie* case of interference. *Id.* To establish a *prima facie* case of ERISA interference, the employee must demonstrate that (1) the employer performed a prohibited action; (2) the action was taken for the purpose of interfering; and (3) the action interfered with the attainment of a right to which the employee is, or may become, entitled. *Id.* (citing *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987)). If the plaintiff establishes a prima facie case, a presumption of illegal interference arises, and the burden of production shifts to the employer to produce evidence of a legitimate reason for the challenged conduct. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (Title VII case). "If the employer carries its burden and successfully demonstrates a legitimate, nondiscriminatory explanation, the burden then shifts back to the plaintiff, who is given the opportunity to establish by a preponderance of the evidence that the defendant's explanation is pretextual." *Goode*, 874 F. Supp. 2d at 853.

These two methods of proof establish the standards to prove ERISA interference at trial. But, at the motion to dismiss stage, they only serve to inform a court's evaluation of the allegations. Accordingly, as in the analogous context of a Title VII discrimination claim, a complaint need not "contain specific facts *establishing* a prima facie case . . . under the

framework set forth in *McDonnell Douglas*." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002) (Title VII case) (emphasis added). Rather, as with any other claim falling within the purview of Rule 8(a), "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010), *aff'd,* ___ U.S. ___, 132 S. Ct. 1327 (2012) (Title VII case).

Kirby contends that he has "alleged facts which are sufficient to state an ERISA 510[5] interference claim under both the direct and circumstantial models of proof." Opp. at 11. As discussed, the precise method by which plaintiff will prove his case at trial is not particularly relevant at the motion to dismiss stage. Accordingly, I will examine the Complaint to determine whether it states a plausible claim for relief under 29 U.S.C. § 1140.

Plaintiff's claim can be interpreted in two ways. First, plaintiff might be challenging Frontier's decision to delay firing him until after the closure of the one-year window. In other words, he might be alleging that Frontier kept him on the payroll longer than it otherwise would have, for the sole purpose of allowing his severance rights to expire. This appears to be the claim to which Frontier responds in its Memo. Frontier argues that "keeping an employee on the payroll . . . is not conduct prohibited under ERISA," Memo at 9, and it cites several cases for the proposition that ERISA does not prohibit retaining an employee to avoid the payment of severance benefits. Memo at 9–11 (citing, *e.g.*, *Sallee v. Rexnord Corp.*, 985 F.2d 927, 929 (7th Cir. 1993) ("[W]hile section 1140 protects plan participants from discharge, suspension, and the

---

[5] 29 U.S.C. § 1140, which governs ERISA interference claims, was originally enacted as § 510 of the Employee Retirement Income Security Act of 1974. Accordingly, it is often referred to as "ERISA § 510" or "ERISA 510."

16

like, it does not appear to protect them from continued employment.")). However, in my view, this is not the argument that plaintiff makes.

Kirby's actual argument is that Frontier "manipulat[ed] the termination process for the sole purpose of depriving the Plaintiff of his severance benefits." Opp. at 13. His argument proceeds as follows: (1) Frontier fired him on January 24, 2012, when it relieved him of all of his responsibilities and stripped him of access to company systems and facilities; (2) even though Frontier fired Kirby on January 24, 2012, Frontier wrote in the Notice of Termination that his Date of Termination was February 23, 2012; (3) Frontier selected that date with the specific intent of depriving Kirby of his severance benefits; and (4) Frontier's manipulation interfered with Kirby's right to severance pay. Thus, the argument is not that Frontier "should have terminated [him] earlier." *But see* Memo at 2. Rather, it *did* terminate Kirby in January, but then dishonestly set the Date of Termination as February 23, 2012. *See* Complaint ¶ 42 (alleging that Frontier violated § 1140 by "manipulating . . . the date in which the Plaintiff's termination would be effective for the sole purpose of depriving the Plaintiff of severance benefits"); *id.* ¶ 17 ("The Defendant . . . in fact terminated the Plaintiff from employment on January 24, 2012).

Plaintiff's allegations, taken as true, set forth a plausible claim that Frontier interfered with Kirby's right to severance benefits, in violation of 29 U.S.C. § 1140. Viewing the facts in the light most favorable to plaintiff, Frontier acted with the intent to deprive Kirby of his severance benefits. Mitchell, Frontier's CEO, allegedly told plaintiff on November 16, 2011, that he intended to fire him after the expiration of plaintiff's eligibility for severance benefits. Then, on January 24, 2012, Frontier notified plaintiff of his termination, effective one week after the expiration of eligibility for severance benefits. Although Frontier retained Kirby on the company's books as an employee, and continued to pay his salary until February 23, 2012, he

was immediately stripped of all of the typical indicia of employment: he was relieved of any work responsibilities and was denied access to the facilities.

There surely are benign reasons why a company would pay an employee for thirty days after stripping him of all responsibilities. But, there is also the possibility that Frontier had improper motives for proceeding in the manner in which it did. That possibility graduates to plausibility in light of the fact that Frontier's decision to pay Kirby his salary for another month, by setting his Date of Termination as February 23, 2012, saved Frontier over $700,000 in severance pay. *See* Complaint ¶ 35.

To be sure, the courts that have addressed the issue have held that keeping someone employed is not prohibited conduct under ERISA. *See, e.g.*, *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003) (rejecting argument that "§ 510 prohibits the passive act of retention . . . meant to interfere with pension benefit rights"); *Caldwell v. PNC Fin. Servs. Grp., Inc.*, 835 F. Supp. 2d 510, 524 (S.D. Ohio 2011) ("As a matter of law, keeping plaintiff on the payroll did not constitute an adverse employment action and was not conduct prohibited under ERISA."); *Stout v. Bethlehem Steel Corp.*, 957 F. Supp. 673, 694 (E.D. Pa. 1997) ("Offering a job, or the chance to continue employment, has never been prohibited employer conduct, and it would be a ludicrous distortion of ERISA to make it so."). But, the question is whether Kirby really was employed, as that concept is commonly understood. If Frontier had waited until February 23, 2012, to take any action regarding Kirby's employment, presumably there would not have been an ERISA violation. But, at the other end of the spectrum, it presumably would be illegal for an employer to fire *and* stop paying an employee in January while arbitrarily designating the Date of Termination as February.

The case *sub judice* falls in between these two hypothetical scenarios. Frontier avers that, like the first hypothetical employer, it kept Kirby in its employ through February 23, 2012, by paying him until the one-year window closed. Therefore, its avoidance of severance obligations was legal. Kirby counters that, like the second hypothetical employee, his employment was terminated in January, notwithstanding that he continued to receive a salary through February. Thus, the case boils down to the factual question of whether Kirby, who was kept on the payroll but stripped of all responsibilities and access to company facilities, remained an employee of Frontier through February 23, 2012 or, alternatively, whether Kirby was actually terminated on January 24, 2012.[6] *See generally Parrett v. City of Connersville, Ind.*, 737 F.2d 690, 694 (7th Cir. 1984) ("To pay a man without asking him to do any work in exchange . . . might appear to make his 'working' conditions paradisal rather than infernal. This might well be true if the work was dirty, dangerous, unhealthy, backbreaking, repetitive, or otherwise disagreeable, or if the worker had the personality of a remittance man. [But] [f]or anyone with some self-respect the position that [defendants] placed [plaintiff] in was intolerable."). Whatever the answer to that

---

[6] In other contexts, which may provide guidance, the legal effect of an employee being placed on paid leave varies with the circumstances. *Compare Wozniak v. Conry*, 236 F.3d 888, 889–90 (7th Cir. 2001) (holding that fact question existed regarding whether professor was deprived of a property interest when he was "foreclosed from teaching, barred from researching and assigned instead to manage his department's website"), *and Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (holding that it was for the jury to decide whether employee was constructively discharged when he was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"), *with Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006) (holding that an employer's decision to place an employee on paid administrative leave during the pendency of an investigation did not constitute an adverse employment action for purposes of Title VII), *and Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005) (holding that "a person who is on leave with pay . . . pending an investigation of serious job misconduct, who resigns . . . has not from an objective standpoint been constructively discharged").

question, it is not one to be determined by the Court on a motion to dismiss.[7] It appears to be a fact question, to be resolved by the finder of fact. Accordingly, I will deny the Motion as to Count II of the Complaint.

## CONCLUSION

An Order implementing this ruling follows.


Date: October 30, 2013                                /s/
                                                     Ellen L. Hollander
                                                     United States District Judge

---

[7] If Kirby were to prevail on this point, Frontier would be permitted to offer evidence of a legitimate, nondiscriminatory reason for setting the Date of Termination as 30 days after Kirby's employment was terminated (*e.g.*, a company policy of giving thirty days of notice and "garden leave" to all terminated employees).